Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission modifies and adopts the Opinion and Award of the Deputy Commissioner.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. (I.C. 420847)Defendants paid compensation to plaintiff for temporary total disability from 2 March through 4 May 1994, and on 21 December 1994.
2. (I.C. 640599)At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers Compensation Act.
3. ((I.C. 640599)The employer-employee relationship existed between defendant-employer and plaintiff.
4. (I.C. 640599)St. Paul Fire Marine Insurance Company was the carrier on the risk.
5. (I.C. 640599)The date of the alleged injury was 1 November 1994.
6. (I.C. 640599)Form 22 dated 8 October 1996, was stipulated into evidence.
In addition, the parties stipulated into evidence regarding both cases the following:
a. Fifty-two pages of medical records and reports.
b. Seven additional pages of medical records and reports from Frye Regional Medical Center.
c. An indexed notebook of medical records and reports.
d. Discovery responses along with a stipulation of discovery dated 23 June 1997.
e. Report by Dr. Maloney dated 23 September 1997.
Furthermore, a letter by Dr. Broadwell dated 1 September 1997 was received into evidence as a plaintiffs exhibit.
***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is fifty-two years old and who has a ninth grade education, began working for defendant-employer at its winery in June 1990. He had previously had a long period of employment at a textile mill but had also worked on a farm for eighteen months. During the first four years of his employment, he was considered to be a good employee who was reliable and who could learn new tasks. His job duties varied according to the season but included pruning and training grape vines, operating a tractor to hedge and mow, applying pesticides, helping with the harvest and working on the equipment.
2. On 2 March 1994, plaintiff sustained a compensable injury by accident. He was working on a bush hog using a large drill when the drill bit became hung, causing the drill to suddenly twist around. The force of the movement caused plaintiff to fracture and dislocate the middle and ring fingers of his left hand. He was taken to the hospital where x-rays were performed which revealed displaced comminuted fractures of the proximal phalanges which extended into the joints. Dr. Thompson realigned the fractures and splinted his fingers. Plaintiff then saw Dr. Lechner, a hand surgeon, who performed surgery to his fingers on 9 March 1994, to reduce the fractures and to apply internal fixation devices to hold the bones in place.
3. Following the operation, Dr. Lechner followed plaintiffs progress and ultimately referred him for physical therapy. He was allowed to return to one-handed work on 5 April 1994, and apparently returned to work on that date wearing a sling. Since pruning could be done with one hand and he was right-handed, he performed that task. He was allowed to leave work to attend physical therapy sessions. On 16 May 1994, Dr. Lechner released him to return to work without restrictions and on 17 June 1994, the doctor discharged him from medical care with no permanent work restrictions. At that appointment, Dr. Lechner indicated that the swelling was almost gone, that there were specific areas of tenderness but that the joints were completely congruous. He rated plaintiff with a thirty-five percent permanent partial disability of the ring finger and a forty percent permanent partial disability of the middle finger.
4. Plaintiff did not receive further medical care for almost six months. During that time, he performed his regular job duties without complaint, although if questioned he would say that he might have some swelling or a little pain. Despite the ongoing symptoms, he was able to maintain his former level of productivity.
5. On or about 1 November 1994, plaintiff was standing next to a tractor when the side arm on the tractor dropped, landing on his right foot. The bar was quite heavy and his foot was noticeably bruised after the incident, but he did not want to report the injury. He showed it to Harley Mangum, a co-worker, who insisted that he show it to Beth Wynne, the employee who had the first-aid kit and who filled out accident reports. Plaintiff initially refused to show her and tried to hide it from her. However, he later showed his foot to her although he still did not want an accident report completed and did not want to see a doctor. Consequently, the injury was not documented and his supervisor was never notified about it. He limped slightly for a couple of days but made no further mention of the injury and did not appear to have further difficulty with his foot.
6. By December 1994, plaintiff asked that his hand be re-evaluated, and he was seen by Dr. Minkin, one of Dr. Lechners partners, on 7 December 1994. He complained of continued pain and stiffness and of angulatory deformity of the middle finger. On examination, Dr. Minkin found limitation of motion of not only the injured fingers but also the index finger, and rated him with seventy percent of the middle finger, sixty percent of the ring finger and ten percent of the index finger, or twenty-five percent of the hand as a whole. No further treatment was recommended.
7. Defendants sent plaintiff to Dr. Naso for another opinion and he noted that plaintiffs middle finger was growing towards his index finger and that plaintiff was complaining of continued pain, stiffness and swelling. However, no further treatment was recommended and Dr. Naso rated him with a twelve percent permanent partial impairment of his left hand.
8. Plaintiff experienced persistent pain in his left hand that gradually grew worse, but he was not a complainer and continued to perform his regular job. His coworkers were unaware that he was having problems. In fact, his work performance was excellent and he took on additional duties related to frost damage control. However, in June 1995, he obtained a referral to Dr. Poehling, an orthopedic surgeon at Bowman Gray School of Medicine who treated a large number of patients with reflex sympathetic dystrophy. Dr. Poehling examined him on 15 June 1995, and recognized that his left hand symptoms were probably due to a dystrophic response. Plaintiff also complained of pain in both legs and in his right foot at that appointment. He had broken the tibia in his right leg in 1976 in a motor vehicle accident and had had some difficulties with it since that injury.
9. Dr. Poehling prescribed medications to treat the reflex sympathetic dystrophy and performed tests to confirm the diagnosis. The test results were not conclusive, but the doctor was satisfied that plaintiff had reflex sympathetic dystrophy.
10. On 23 June 1995, plaintiff decided that the pain was too severe to continue working. He advised staff members that he was leaving but did not explain why. On 28 June, he called and spoke to Dr. Poehlings physicians assistant explaining that the pain was too severe to continue working, and he was advised to stay out of work if no light work was available. He then returned to Dr. Poehling on 6 July 1995, and reported that he had also developed increasing back pain since the previous appointment.
11. Dr. Poehling treated plaintiff through 31 July 1995, when plaintiff reported increased pain from having to drive so far for treatment. Dr. Poehling referred him back to Dr. Lechner for treatment of his dystrophy. When Dr. Lechner saw him on 16 August 1995, plaintiff was anxious and cried easily. Both of his hands appeared to sweat excessively and the left hand had diffuse swelling. Dr. Lechner concurred with the diagnosis of reflex sympathetic dystrophy and recommended further treatment.
12. Defendants retained the services of Joanne Hartley, a medical case manager, who arranged for plaintiff to undergo a multi-disciplinary evaluation in Charlotte at the Mid-Atlantic Center which she believed was the best facility in the area for a chronic pain problem. Accordingly, plaintiff traveled to Charlotte and was seen by four different doctors on 21 and 22 November 1995. At this time plaintiff was complaining of pain throughout his body, he was walking with a cane and was clearly depressed. Dr. Aronoff, Dr. Jassewski and Dr. Perlik examined his left hand and arm and found none of the typical signs of reflex sympathetic dystrophy. There were no color changes, edema, temperature changes or atrophy, yet he was not using the arm because of pain. The symptoms he described far exceeded the objective findings on examination. Consequently, he was diagnosed simply with chronic hand pain of uncertain etiology.
13. Plaintiff was also evaluated by Dr. Simpson, a psychologist. Dr. Simpson noted intense somatic preoccupation and that plaintiff was desperate for assistance but had only limited insight into his problems. It appeared that he might be having panic attacks, as well. Dr. Simpson concluded that plaintiffs behavioral maladaptation regarding the injury had contributed to a severe chronic pain syndrome. He and the other doctors recommended an inpatient pain management program.
14. Plaintiff was very unhappy with the results of the evaluation, probably because of the strong psychological component identified, and he did not want to be so far from home for treatment. Consequently, he resisted efforts to have him admitted to the program at Mid-Atlantic Center. After consultation with the Industrial Commissions rehabilitation nurse, a decision was made to send him to The Work Place and he was evaluated by Dr. Blanchat there on 8 May 1996. At that examination, plaintiff described for the first time the injury he had sustained to his foot in November 1994, although he apparently made it sound like an injury to his leg, and he complained of weakness in the leg to the point that he was prone to falling. He also described severe pain in both arms, both legs and his low back.
15. When defendants received Dr. Blanchats report, an issue was raised as to what effect the November 1994 injury had on plaintiffs chronic pain syndrome. A second claim was filed regarding the subsequent injury, which involved a different insurance carrier, and there was further delay in the case. Plaintiff received treatment only from Dr. Lee, his family doctor, during that time.
16. In April 1997, plaintiff was evaluated at Thoms Rehab. Dr. Broadwell, a physiatrist there, examined him on 17 April, and found him to be severely non-functional. He demonstrated dramatic pain behavior with such severe guarding that it was impossible for the doctor to evaluate the movement of his limbs. He also appeared to be in extreme psychological distress. Dr. Broadwell diagnosed him with 1) chronic pain syndrome, 2) possible reflex sympathic dystrophy, and 3) remote fracture of his right proximal tibia. A three-week pain management program was recommended. Plaintiff then entered the program at Thoms. As part of the program, he was taught coping skills and he experienced some improvement. However, after two additional weeks of treatment in August, he remained significantly impaired.
17. Plaintiff underwent a final evaluation by Dr. Maloney on 23 September 1997. Dr. Maloney diagnosed him with reflex sympathetic dystrophy of the left upper extremity with significant physical and emotional sequelae, plus diffuse musculoskeletal pain associated with degenerative disk disease of the cervical and lumbar spine, degenerative joint disease of the right knee and chronic right shoulder and right foot pain. Dr. Maloney did not think that plaintiff would be able to work in the foreseeable future.
18. Defendants in I.C. 420847 have admitted liability for plaintiffs 2 March 1994 injury by accident and have paid compensation to him for temporary total disability from 2 March through 4 May 1994, and on 21 December 1994, pursuant to Form 21 and 26 agreements approved by the Industrial Commission. However, they have contested the causation of his chronic pain syndrome since he was able to work for a year following the injury and since he had symptoms in other parts of his body when he went back out of work in June 1995.
19. The symptoms plaintiff experienced in his legs, his right foot, his shoulder and his back were not related to his compensable injury of 2 March 1994. However, he did develop a dystrophic response to the left hand injury with increasing pain and sensitivity, and this was his primary physical problem. He did not have adequate coping skills to deal with his reflex sympathic dystrophy and therefore developed a reactive depression with anxiety. As testified to by Dr. Broadwell, the emotional aspect of plaintiffs condition was a significant part of his problem. It led to plaintiffs behavioral response to his pain which was ultimately diagnosed as chronic pain syndrome.
20. Defendants in I.C. 420847 raised as an issue whether plaintiffs disability could be apportioned such that they would be responsible for only that part of his disability which was due to his hand injury. However, the emotional and behavioral response to the hand injury was not addressed when Dr. Broadwell attempted to express opinions on that issue. Furthermore, plaintiffs problems were so intermingled that they could not be separated.
21. By June 1995 plaintiff developed reflex sympathetic dystrophy in his left hand and arm which was a proximate result of his injury of 2 March 1994 and, due to the progressive symptoms from his reflex sympathetic dystrophy, he developed emotional and behavioral problems which culminated in a chronic pain syndrome. As a result of his reflex sympathetic dystrophy and chronic pain syndrome, he was unable to work in any capacity from 24 June 1995, through the date of hearing on 10 March 1997. As of the latter date, he had not reached maximum medical improvement in that he required a pain management program to help him cope with his symptoms. He continued to be unable to work at that time.
22. Defendants in I.C. 420847 have also alleged that plaintiffs disability was due in part to his 1 November 1994 foot injury. Plaintiff did sustain an injury by accident arising out of and in the course of his employment on that date. The fact the tractors side arm fell on his right foot constituted an unusual occurrence which interrupted his regular work routine. However, he sought and received no medical treatment following the injury; he complained of no problems with his foot for over six months; and, when he did first mention foot pain to a doctor, he did not attribute it to the injury. None of the doctors who treated plaintiff considered the foot pain to be a significant problem, and it does not appear that he ever received medical treatment specifically for symptoms in his foot. Plaintiffs temporary total disability was not proven to have been due, even in part, to his foot pain, and he sustained no permanent partial disability to his foot as a result of the injury.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. (I.C. 420847)In that plaintiffs physical injury of 21 March 1994, led to reflex sympathetic dystrophy and then to emotional and behavioral problems which resulted in his developing chronic pain syndrome, and in that his problems were so intermingled that they could not be separated, defendants are liable for his full disability. N.C. Gen. Stat. 97-29.
2. (I.C. 420847) Plaintiff is entitled to compensation at the rate of $164.41 per week for eighty-nine and three-sevenths weeks for the additional temporary total disability he sustained as a result of this injury by accident for the period from 24 June 1995, through the date of hearing on 10 March 1997, and then continuing thereafter for as long as he remains so disabled. N.C. Gen. Stat.97-29.
3. (I.C. 420847) Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. 97-2(19); N.C. Gen. Stat. 97-25.
4. (I.C. 640599)On 1 November 1994, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. 97-2 (6).
5. (I.C. 640599)There were no compensable consequences to plaintiffs 1 November 1994 injury in that he received no medical treatment for his foot and he did not sustain any disability, either temporary or permanent, as a result of the injury. N.C. Gen. Stat. 97-2 et seq.
6. (I.C. 640599)Plaintiff is not entitled to benefits under the Workers Compensation Act for his foot injury. N.C. Gen. Stat. 97-2et seq.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. (I.C. 420847)Defendants shall pay compensation for temporary total disability at the rate of $164.41 per week for eighty-nine and three-sevenths weeks for the period from 24 June 1995, through 10 March 1997, and then continuing thereafter for as long as he remains so disabled. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorneys fee hereinafter approved.
2. (I.C. 420847) Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. (I.C. 420847)An attorneys fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiffs counsel. He shall receive a lump sum from the accrued compensation and shall thereafter receive every fourth check.
4. (I.C. 420847)Defendants shall pay the costs.
5. (I.C. 640599)Plaintiffs claim for workers compensation benefits is hereby DENIED.
6. (I.C. 640599)Each side shall pay its own costs.
This the day of January, 2000.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_______________ LAURA K. MAVRETIC COMMISSIONER
S/_______________ RENÉE C. RIGGSBEE COMMISSIONER